IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 07 CR 773-1 |
| v. | ) | |
| | ) | Honorable Charles R. Norgle, Sr. |
| JOSHUA HINES | ) | |

## NOTICE OF FILING

To:    **JULIE RUDER**                              **SHEILA LAVIN**
        Assistant U.S. Attorney                    U.S. Probation Officer
        219 S. Dearborn, 5th Fl                     55 E. Monroe, Ste 1500
        Chicago, IL 60604                            Chicago, IL 60603

Please take notice that on this 15th day of August, 2008, the undersigned filed the following document(s) in the above captioned cause, a copy of which is attached hereto:

**DEFENDANT HINES' SENTENCING MEMORANDUM
and REQUEST FOR MANDATORY MINIMUM SENTENCE**


Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Terence F. MacCarthy
Executive Director

By:  s/   Helen J. Kim

FEDERAL DEFENDER PROGRAM
55 E. Monroe, Suite 2800
Chicago, IL 60603
(312) 621-8344

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 07 CR 773-1 |
| v. | ) | |
| | ) | Honorable Charles R. Norgle, Sr. |
| JOSHUA HINES | ) | |

**DEFENDANT HINES SENTENCING MEMORANDUM and**
**REQUEST FOR MANDATORY MINIMUM SENTENCE**

Defendant JOSHUA HINES, by the Federal Defender Program and its attorney, HELEN J. KIM, respectfully requests, pursuant to *United States v. Booker*, 125 S.Ct. 738 (2005), and 18 U.S.C. § 3553(a), that this Court impose a sentence of exactly ten years in prison, which is the minimum term of incarceration required under 18 U.S.C. § 841(b)(1). In further support of this request, Mr. Hines states as follows:

I.   **Who is Joshua Jerow Hines?**

A.   **Introduction**

Joshua Hines is a single, twenty-four year old, African American man who was forced to become a man responsible for himself and others at a very young age. Now, in a time that some may say are the prime years of his life, he faces the frightening reality that he will be forced to be away from his family and society for the minimum term of ten years. As a man who has never been in prison before, the last eight and a half months since his arrest have already been eye-opening. His life has changed dramatically, and his actions have affected others who need him in

1

their lives. Most troubling, however, is the uncertainty he feels about how his two young children will fare without him as their provider. Janiya is now only five, and Jamarius is only six. But he has no other choice but to look forward to the day he will someday be reunited with his family.

### B.  Joshua Hines' History and Childhood

Joshua, who goes by the name "Josh," was born in 1983 to his father, Clark, and his mother, Ann Hines. PSR at 8. He grew up in Chicago as the middle of three: his older brother, Jafeal, was four years older; his younger sister, Jantel, was eight years younger than he. PSR at 9. During Mr. Hines' earliest years, his father worked for the U.S. Post Office as a letter carrier while his mother was not working. By the time Mr. Hines was ten years old, however, his childhood memories included many times of being left alone by both parents. PSR at 8. His father, although a functional drug user at one time, eventually spent every paycheck on himself and his wife to feed their addictions. His mother, by contrast, was in and out of the home, in and out of jail and later in prison, but consistently unable to meet the needs of any of her children.

Mr. Hines' entire family verify that he was a child raised in an unpredictable, chaotic and neglectful environment through no fault of his own. By the time he was twelve, Jantel was four at the time, Mr. Hines stopped attending school so that he could be physically present to care for his younger sister, who goes by "Jan." As Ann Hines wrote in a letter to the Court, "My son took my place and his father's place when he took on the role of raising his sister, my daughter. So that she wouldn't be put into the system." "My son did his best your Honor to make sure that my daughter had food to eat and clothes to wear." *See* Exhibit A, Letter from Ann Hines.

Similarly, Clark Hines wrote, "Your Honor, Joshua is truly at fault but me and his mother

2

truly are at blame while we were raising Joshua we were both taking drugs and doing what we wanted to do." *See* Exhibit B, Letter from Clark Hines. He later wrote, " . . . please understand Joshua's situation and please try to understand that truly if me and my ex wife would have been taking care of business maybe Joshua would not be in this situation . . . ."

Yet as Jantel Hines knows best, it was Joshua Hines who saved her, protected her, and kept her on a path that would enable her to achieve personal success. As she states in a letter to the Court, "He is kind, generous, caring, brave, courageous, and many more great things. Joshua has done many great things. Including taking me into his house when I was about nine or ten. He is the reason why I have so many goals I do now and why I am so great at school. Joshua made sure that when I came home I did my homework before I did anything else. He made sure that I always had food to eat, clothes on my back, a roof over my hood, and was secure. He always told me to go to school, get good grades, go to college and then I could have a boyfriend. It used to make me laugh so hard, but I believe in that know. Boys are trouble and he only wants to make sure that I make the right decisions." *See* Exhibit C, Letter from Jantel Hines.

While Jafael Hines was given the opportunity to go live with his godparents, Joshua and Jantel had no choice but to fend for themselves. For this reason, Jafael looks up to his younger brother for doing things even he could not do when they were younger. *See* Exhibit D, Letter from Jafael Hines. He wrote to the Court about how Mr. Hines "did a good job, a real good job" with their little sister. He describes how, for the last five years, "maybe even longer, [Mr. Hines] was the one that bought [Jantel] school clothes, school supplies, paid for doctor visits, everything that a parent's supposed to do for their child, he did for my sister." *Id.* at 2; *see also* Exhibit E, Interview Summary of Jafael Hines.

3

Now about to enter her junior year at West Aurora High School, Jantel is proud to have a 3.4 grade point average and she holds ambitions to enter law school or become an accountant. *See* Exhibit F, Interview Summary with Jantel Hines. She spoke of, during her interview, how Mr. Hines acted as her father and her mother. *Id.* at 2. Beyond the physical nurturing, dedication to her activities and schooling, provision of basic essentials such as food, clothing and shelter, Mr. Hines also protected her. He made sure she did not see certain things. He spoke to her, gently, about the effect of drugs on his father and mother. He taught her, through his constant but loving lectures, the value of love, family, studying and future educational endeavors. All this is only more amazing because of the fact that Joshua Hines was unable to pursue any of these things for himself.

By the age of fourteen, he was, instead, forced to support himself and neglect his own education. He obtained his own apartment. *See* Exhibit G, Interview Summary of Joshua Hines. By the age of sixteen, Mr. Hines had dropped out of school entirely, and he never had the chance to obtain his G.E.D. thereafter. PSR at 10-11. Instead, as he felt responsible for the support of himself and his sister, he began earning money the only way he learned from others in his neighborhood. He began selling drugs. PSR at 8. Then, in 2001 and by the age of eighteen, Mr. Hines began a serious relationship with a woman named Kevia Thomas.

Mr. Hines and Ms. Thomas knew each other from the neighborhood in which they grew up. When Mr. Hines learned she was pregnant with her first child, Jamarius, now six years old, he also learned that Jamarius' biological father was not taking part in Kevia's pregnancy. He was already aware of the fact that Kevia also had a very difficult childhood; she was from a family of eleven that never had much of what they needed growing up. Ex. G at 2; *see also* Exhibit H,

4

Interview Summary of Kevia Thomas. Knowing that her child was going to be born into this world without a father made Mr. Hines want to be part of this unborn child's life. He verbally announced his desire to step-in and become Jamarius' surrogate father. He expressed the importance of having someone there to help care for a child and provide for the child financially. He did not want the unborn child to grow up without a father because of his own experiences as a child.

By all accounts, Mr. Hines was, and is, an involved, loving, giving, and good father to Jamarius. But a year after Jamarius was born, Mr. Hines and Kevia became pregnant with their own child, Janiya, who is now five years old. PSR at 9. Mr. Hines became the full, complete financial supporter for himself, his sister, who was ten at the time, Kevia, who was not working, and their two children by the age of nineteen. As his brother said, "He knew what he was doing wasn't right, but his kids were clothed and feed [sic], had somewhere to lay their heads." Ex. D at 2. In fact, Mr. Hines was renting a town home in Aurora that was nicely furnished and orderly. PSR at 9. As a father, he tried to be careful with the children, and he made sure that he never exposed them to his illicit activities.[1] He helped them with their homework and he read them books before putting them to bed. *See* Exhibit I, Letter from Kevia Thomas. Indeed, his children love him dearly and miss him greatly. Although they see him every 2 weeks at the M.C.C., they ask their mother when they will be together again without a true understanding of what length of time it will be. *Id.* at 2.

---

[1] His sister says that he would engage in his illegal activities after the children were asleep or when they were away in school. Ex. F at 2.

5

### C. Joshua Hines Can Still Contribute to Society and Be a Role Model to Others

Although the government may believe that engaging in drug distribution makes Mr. Hines a terrible person, he was and is, in fact, an individual who has the ability to be a role model to others. Beginning at an extremely young age, Mr. Hines garnered respect from others in his family and community as he took on the role of caring for his younger sister. He demonstrated countless times, the true value of family, responsibility and being a good parent. Although he is facing a mandatory minimum of ten years in prison, many individuals will be anticipating and waiting for the day that he will be released from prison. They look forward to that day, and ask the Court to consider the sacrifices he has made in the name of his family. *See* Group Exhibit J, Letters from Pastor Tracy L. DeVolt, Sherette Johnson, Shira Lishman, Minister Glenda DeKing, Harold White, Minister Lillie Harden, Tracy Grimes, and Evelyn Grimes.

As the kind of individual who lives his life with the primary goal of trying to make others happy, it seems that Mr. Hines was plagued by his own experiences, always wanting to help others feel less neglected, abandoned, or wanting for anything. When anyone needed anything, Mr. Hines who would never say "no," according to those who know him. "He would give up his last dollars if it made another person happy." Ex. I at 3. As one of his cousins wrote, "If you knew Joshua personally as we do, you would know that he truly is a genuinely great person." *See* Exhibit K, Letter from Clifton and Brandi Grimes. As M.S.W. Intern Deresha Gibson stated in her Integrative Summary regarding Joshua Hines, ". . . posttraumatic growth is based on the premise that some people who experience trauma and adversity are able to use the traumatic experience as a means to increase personal growth and development." *See* Exhibit L, Integrative Summary by Deresha Gibson, Loyola University M.S.W. Intern at the Federal Defender

Program. "Mr. Hines shows tremendous qualities by his very ability to provide for himself and his sister in particular." *Id.* at 7. Importantly, he has many identifiable strengths.

## II.     Unjust Sentencing Will Result If Joshua Hines Receives a Sentence Over 10 Years.

The primary directive in 18 U.S.C. § 3553(a) is that the Court impose a sentence "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. *See* 18 U.S.C. § 3553(a) (emphasis added). Those purposes are listed to include the following goals:

- to reflect the seriousness of the offense, promote respect for the law, and provide just punishment
- create adequate deterrence
- protect the public from future crimes of the defendant; and
- to provide the defendant with necessary treatment and training.

18 U.S.C. § 3553(a)(2). But 3553(a) lists additional factors for the Court's consideration, which include:

- the nature and circumstances of the offense ((a)(1))
- the history and characteristics of the defendant ((a)(1))
- the kinds of sentences available ((a)(3))
- the sentencing guideline range ((a)(4))
- pertinent Sentencing Commission policy statements ((a)(5)) and
- the need to avoid unwarranted sentencing disparities ((a)(6))

18 U.S.C. § 3553.

We ask this Court to consider the question of whether a term in the Bureau of Prisons longer than ten years would do anything more to further the goals of sentencing under 18 U.S.C. § 3553(a). We confidently assert the answer must be no.

In this case, a longer sentence of prison than ten years, the minimum required by statute, will not provide Mr. Hines with any treatment or training that he needs. It will not serve any protective purpose because danger, or the need for protection from him, is simply a non-factor in

his case. He has never served any prison time before now. As stated earlier, his criminal history includes only one 2001 Possession of a Controlled Substance for which he received 24 months probation (PSR at 3), and two Driving on a Suspended License charges for which he received a consolidated 60 days of jail and one year of conditional discharge (PSR at 5).

### A. Category III Significantly Overrepresents the True Seriousness of Mr. Hines' Prior Convitions and Inaccurately Predicts his Risk of Recidivism.

Although the requirements of 21 U.S.C. § 841(b)(1)(A) cannot be avoided in this case, we do ask the Court to recognize that a criminal history category of III significantly overstates the seriousness of Mr. Hines' prior record and fails to accurately predict his likelihood of recidivating. Mr. Hines is not safety valve eligible because of one prior simple possession case, and two driving on a suspended license cases.[2] We submit that these specific prior convictions would have warranted a reasonable argument for downward departure in a pre-*Booker* era under the theory captured in § 4A1.3. In that section, it states:

> If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

U.S.S.G. § 4A1.3(b)(1)(2006). The application note to that section further states:

---

[2] In order for a defendant to avoid a minimum term sentence under 3553(f), the defendant cannot have more than 1 criminal history point; he cannot use violence, threat of violence, or possess a gun or dangerous weapon in connection with the offense; the crime can not have resulted in death or serious injury to anyone; the defendant could not have been an organizer, leader, manager or supervisor of others nor engaged in a continuing criminal enterprise; and before sentencing, the defendant must provide the Government with information and evidence about the crime. See 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2. In this case, only the first listed criteria disqualifies Mr. Hines from possible benefit of this section.

8

> A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period. A departure below the lower limit of the applicable guideline range for Criminal History Category I is prohibited under subsection (b)(2)(B), due to the fact that the lower limit of the guideline range for Criminal History Category I is set for a first offender with the lowest risk of recidivism.

U.S.S.G. § 4A1.3, n.3.

Here, the simple fact that two driving violations are now forcing this Court to issue a sentence of nothing less than 120 months is problematic on many levels. The fact that someone such as him, who has never been in prison before and with an advisory range that is substantially less than the mandatory minimum sentence suggests that the law continues to have errors despite the Sentencing Commission's changes to the guideline offense levels concerning crack cocaine. Yet this is especially true when reliable evidence supports the notion that Mr. Hines' is unlikely to commit more crimes when he is released from prison.

    **B.**    **Mr. Hines Has Learned a Valuable Lesson Already and a Sentence Longer than 120 Months Will Achieve Anything More Under 18 U.S.C. § 3553 Than a 120 Month Sentence Will Achieve.**

In this case, Mr. Hines' transaction with the CI occurred on May 4, 2007. On November 28, 2007, well over six months after that transaction, a federal arrest warrant was issued that allowed ATF Agents, the Illinois State Police, and the Aurora Police arrest Mr. Hines. *See* Gov't Version, Ex. 3 at ¶ 1. While it is unclear what caused the delay between the transaction in May and Mr. Hines' arrest, when Mr. Hines was arrested and transported to the Aurora Police station, he was interviewed by ATF Agents Mark Anton and Illinois State Police Officer Tim Tippet. *Id.* at ¶ 1-2. At that time, he waived his Mrianda Rights and signed a Waiver Concerning Timing of

9

Initial Appearance Before the United States Magistrate Judge. *See id.* at ¶ 2; *see also* Exhibit M, Statement of Rights Waiver and Waiver. He gave law enforcement verbal consent to search his townhouse in Aurora. *Id.* at ¶ 4. As Kevia Thomas and the children were not at home at the time, Mr. Hines gave his keys to the officers so they could enter his townhome alone. *See* Exhibit N, Illinois State Police Report.

Yet others have referenced to a desire to change that began for Mr. Hines even before he was arrested in this case. In Kevia, Jafael and Jantel Hines' interviews, all three reference their belief that their brother was burdened by his financial responsibilities. They know he had a desire to stop dealing drugs, but unfortunately, he could not see viable options to get out of what he was doing yet continue providing for his family. In his own statement after his arrest, it says, "HINES stated that he has been taking care of his sister (Jantel) for the past six years and she is a student at Aurora West High School. HINES Said his mother is in prison and his dad is a drug user living in Maywood, IL. HINES said he has been forced to 'hustle' in the crack cocaine trafficking to take care of his immediate family and his sister." Gov't Version, Ex. 3.

But as Jafael Hines wrote, Joshua Hines ". . . understands that this is teaching him a lesson, a hard one." Ex. D at 2. As Tracey Grimes wrote, in her letter to the Court, "He has changed the way he thinks, he knows its o.k. to ask for help and that he doesn't have to do it all by hisself [sic]." *See* Group Ex. J, Letter from Tracey Grimes. In Kevia Thomas' letter, she writes, " . . . I miss Josh so much. When I visit him we talk about us, we talk about the kids. We also talk about how he doesn't want to spend so much time locked up because he doesn't want to miss out on the kids growing up, he doesn't want to miss any part of their life." Ex. I at 2. In his own letter to the Court, he expresses his sorrow, remorse, regret, and desire to do something

different with his life. *See* Exhibit O, Letter from Joshua Hines.

Mr. Hines writes of how he knows he is missing critical years in his children's lives. He is losing the ability to teach them ". . . right from wrong because I know how it is to not have a father in a child's life." He admits he has done wrong, he has hurt a lot of loved ones, but most importantly, he writes, ". . . I have truly learned my lesson. I will never again in my life sell a controlled substance. My plan for the future is to get my GED. I will go to barber school, come home, and work with my Auntie at her shop. I want to be a father to my kids and marry my girlfriend, Kevia. I want to be successful in the future and live a normal life." *Id.* at 2; Ex. G at 3.[3]

The idea that the simple prospect of punishment might serve the purpose of deterrence is something recognized by other courts, but is particularly true in Mr. Hines' case. *See United States v. Baker*, 445 F.3d 987, 990 (7th Cir. 2006) (Seventh Circuit affirmed the sentence imposed by the lower court, which found a prison term "would mean more to Mr. Baker than to a defendant who previously had been imprisoned"); *see also U.S. v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to reoffend.")

Mr. Hines is strongly motivated to do something better with his life. He already completed the Adult Continuing Education Parenting Program at the M.C.C. *See* Exhibit P, ACE

---

[3] Stacie White has been interviewed twice regarding her relationship with Joshua Hines and present care of Jantel Hines. She confirmed that she owns a hair salon and she would like Mr. Hines to come work for her when he is released so long as he obtains his barber's license while he is in the BOP.

Certificate of Participation. He has made inquiries about the prisons with a barber's license program and he plans to request a transfer to one of those facilities when he is closer to his projected release date from prison.[4] Perhaps his biggest motivation to change, however, comes from the fact that the very thing he was trying to prevent — his children not having a present and available parent — has been thwarted by his own actions.

A longer sentence will also fail to meet any goal of deterrence under 3553 than a ten year sentence will do because Mr. Hines, and others, will already learn such a valuable lesson by his prosecution and mandatory minimum sentence alone. Moreover, others will not see a longer term of incarceration as being something he deserves or should receive in order for him to be "justly" punished. Instead, the reverse is true, as we know from the letters submitted. In many ways, Mr. Hines has already received the full benefit of any deterrent effect of punishment by the simple fact that he has been prosecuted in this case.

Indeed, there is nothing to suggest that a longer sentence would deter crime any more than a shorter one would do. *See, e.g.,* The Sentencing Project, *Incarceration and Crime: A Complex Relationship,* at 6-7 (2005), available at www.sentencingproject.org/pdfs/incarceration-crim.pdf. Others have found that the certainty of a sentence is more of a deterrent than is the severity of a sentence. *See, e.g.,* Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules, Finding and Using the Philosophy of the Federal Sentencing Guidelines*, 40 Am. Crim. L. Rev. 19, 61 n.192 (2003). Yet perhaps one of the most consistent reasons to not incarcerate Mr. Hines for

---

[4] Mr. Hines must obtain a GED before he is eligible for a barber program, but there are 6-12 month programs for a barber's certificate available at FCI Florence, Fairton, Montgomery, and Lompac. Mr. Hines is now aware of these programs, but would like the Court to recommend he be placed at Oxford, which is closest in proximity to his family.

more than the statutory minimum of ten years is tied to Mr. Hines' important role as the father to his children.

### C. Mr. Hines Played An Important Role In His Family and Any More Than 120 Months Will Delay His Reunification With Them Unnecessarily.

Mr. Hines' financial support of everyone mentioned in this Memorandum has been, at most times, critical to each and every beneficiary's upbringing and welfare to this point. As stated earlier, Ms. Thomas was not working until after Mr. Hines was arrest. Mr. Hines paid for Jantel, Jamarius and Janiya's schooling and any tuition every year; he paid for school transportation; he provided any and all money for any extracurricular activities and events whenever it was necessary. This was in addition to paying the rent and bills for the household, and helping others out whenever they needed something.

The majority of letters submitted on his behalf recognize the value of Mr. Hines' involvement in his children's lives as well as the lives of others. His good parenting have made him an irreplaceable parent to his son, daughter and sister. While this Court cannot lessen the tragic result that will come from Mr. Hines' incarceration for the next ten years, it can prevent him from being away from his family any longer than is absolutely necessary.

## III. Conclusion

The primary directive in § 3553(a) is to impose a sentence "sufficient, but not greater than necessary, to comply with" the purposes of sentencing, and such must be read consistently with *Booker,* which emphasized, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the

United States may receive and consider for the purpose of imposing an appropriate sentence." *Booker*, 125 S.Ct. 738, 760 (2005).

   WHEREFORE, for all the reasons stated, we respectfully request that the Court sentence Joshua Hines to a term of imprisonment at the mandatory minimum of 120 months under 21 U.S.C § 841(b)(1).

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Terence F. MacCarthy
Executive Director

By:  s/ Helen J. Kim

55 E. Monroe, Suite 2800
Chicago, Illinois 60603
(312) 621-8344

## CERTIFICATE OF SERVICE

The undersigned, Helen J. Kim, an attorney with the Federal Defender Program, hereby certifies that in accordance with FED.R.CIV.P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

**DEFENDANT HINES' SENTENCING MEMORANDUM
and REQUEST FOR MANDATORY MINIMUM SENTENCE**

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on August 15, 2008, to counsel/parties that are non-ECF filers, including:

SHEILA LAVIN
United States Probation
55 E. Monroe Street, 15th Floor
Chicago, Illinois 60603

By:    s/ Helen J. Kim

FEDERAL DEFENDER PROGRAM
55 E. Monroe St., Suite 2800
Chicago, Illinois 60603
(312) 621-8344