UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 07 CR 773 |
| | ) | Hon. Charles R. Norgle, Sr. |
| JOSHUA HINES | ) | |

**RESPONSE TO DEFENDANT HINES' OBJECTIONS TO THE PSR**

Defendant Joshua Hines's Guideline calculation should be based on an offense level 33, which incorporates as relevant conduct his crack-cocaine distribution beyond the quantities set forth in the indictment, and a criminal-history category III, yielding a range of 168 to 210 months. If defendant does not accept responsibility for the counts of conviction *and* relevant conduct, his offense level is 36, and the Guidelines range is 235 to 293 months. A sentence within the Guidelines range is reasonable, and consistent with the factors enumerated in 18 U.S.C. § 3553.

**BACKGROUND**

Defendant Joshua Hines has been convicted of both counts of a two-count indictment, for distributing and possessing with intent to distribute crack cocaine. As Hines acknowledged in a post-arrest statement, these were not isolated instances; he had been buying powder cocaine, cooking it into crack cocaine, and distributing it for an extended period of time.

    A.    **May 2007 Distribution (Count One)**

On May 4, 2007, defendant had a telephone conversation with Individual A, who was cooperating with the government. During the May 4, 2007 conversation, Individual A asked defendant to supply two-and-a-half ounces of crack cocaine to Individual A. Defendant agreed to sell Individual A two-and-a-half ounces of crack cocaine in exchange for $2,000. When Individual A questioned the price, defendant stated, "I ain't gonna put nothin' on there, man. I'm gonna pull it

straight out of the water. . . . Gonna pull it straight out the water. You gotta do two, man. On my momma, I'm gonna pull it straight out, dawg. I ain't gonna do nothing to it. On my momma, I'll pull it straight out," meaning that defendant intended to provide the crack cocaine to Individual A in a pure form, just after cooking it, without adding "cut" or filler to the substance. Defendant instructed Individual A where and when to meet to make the exchange.

At approximately 2:05 p.m. on May 4, 2007, defendant met with Individual A in Aurora, and entered Individual A's car. Defendant supplied Individual A with a plastic bag containing approximately two-and-a-half ounces of cocaine base in the form of crack cocaine. Defendant accepted $2,000 from Individual A, in exchange for the drugs.

The Illinois State Police's Rockford Forensic Science Laboratory tested the substance that was recovered. The forensic scientist's conclusion was that the substance was 64.4 grams of cocaine base. In addition, experienced narcotics task force agents who recovered the substance from Individual A, after Hines delivered it, observed that the white chunky substance's appearance was consistent with crack cocaine. Hines admitted in his plea declaration that he agreed to distribute crack cocaine to Individual A, and he admitted to federal agents in his post-arrest interview that the substance he delivered to Individual A was crack cocaine, and that he routinely cooked powder cocaine into crack cocaine.

      **B.**    **November 2007 Possession with Intent to Distribute (Count Two)**

Agents arrested defendant on a Criminal Complaint on November 28, 2007. Defendant waived his rights, in writing, and agreed to talk to the agents. Special Agent Mark Anton of ATF played the May 2007 recorded telephone call for defendant, where defendant and Individual A negotiated the terms of the crack cocaine deal. Listening to the call, defendant said that he

recognized Individual A's voice on the phone. SA Anton asked defendant if defendant was the other voice on the recording, and defendant said that he was. Defendant told SA Anton that he was going to the city when Individual A called him.

At defendant's request, SA Anton then showed defendant a portion of the video recording, which featured defendant getting out of his car and walking toward Individual A's car. SA Anton asked defendant if that was him in the video, and defendant said "yes," and "He got me." Defendant said that he had his girlfriend and 16-year-old sister in the car with him when he came to make the deal. SA Anton told defendant that defendant sold Individual A two-and-a-half ounces of crack cocaine for $2,000 that day, and defendant said he did, and that he remembered this specific deal.

Early in the interview, defendant verbally consented to officers' searching his residence. Near the end of the interview, agents heard from the team who conducted the search. The search team found and seized approximately a quarter-ounce of crack cocaine, drug paraphernalia for cooking cocaine into crack cocaine, an empty half-kilogram wrapper, and approximately $1,800. There was also cocaine residue in the kitchen. When agents told defendant what had been found, defendant said that all of it was his. Defendant also stated orally and in writing that his girlfriend, who lived in the residence, had nothing to do with the money or the drugs. When asked if the $1,800 was drug proceeds, defendant responded, "What do you think?" (As confirmed by the PSR, defendant had no other income source.) As to the empty half-kilogram wrapper, defendant said it was from approximately two weeks before the search, from his last cocaine purchase from Individual B. Defendant stated that he received a half kilogram of cocaine for $10,500, but gave Individual B only $8,500. Defendant said he still owed Individual B the remaining $2,000.

Concerning the quarter-ounce of crack cocaine located in defendant's residence on November 28, 2007, the Rockford Forensic Science Laboratory tested the substance that was recovered. The forensic scientist's conclusion was that the substance was 9.1 grams of cocaine base. In addition, experienced narcotics task force agents who recovered the substance from defendant's residence observed that the white chunky substance's appearance was consistent with crack cocaine.

### C. Hines's Related Crack Cocaine Trafficking (Relevant Conduct)

According to defendant, for the six months to one year preceding his arrest, defendant purchased cocaine at a rate of approximately four-and-a-half to nine ounces of cocaine every two weeks. Defendant paid approximately $2,800 to $3,000 for four-and-a-half ounces, and $5,800 to $6,000 for nine ounces of cocaine. In addition, in mid-November 2007, as described above, defendant purchased a half kilogram of cocaine for $10,500. Defendant usually paid his source for all the cocaine up front, although occasionally, defendant bought cocaine from his source on credit. Since no later than November 2006, after purchasing cocaine from his source, defendant then cooked the powder cocaine into crack cocaine in the kitchen at defendant's residence in Aurora, and distributed or intended to distribute the crack cocaine to customers, including Individual A. Individual A estimates that he/she purchased powder and/or crack cocaine from defendant approximately 75 to 100 times, including the May 2007 distribution, in amounts ranging from an ounce to two-and-a-quarter ounces.

### D. The Pre-Sentence Investigation Report

The Pre-Sentence Investigation Report calculates defendant's advisory Guidelines range as follows:

|  |  |  |
|---|---|---|
| Base offense level | 36 | (based on the crack cocaine at issue in Counts One and Two of the indictment, and relevant conduct based on Hines's post-arrest statement) |
| Acceptance of responsibility | -2 | |
| Govt. motion for timely plea | -1 | |
| TOTAL | 33 | |

The Report further calculates defendant's criminal history category as III, yielding a range of 168 to 210 months. The government agrees with the calculation in the PSR, provided that defendant fully acknowledges both the offense of conviction and relevant conduct. If defendant frivolously contests relevant conduct, he should receive no downward adjustment for accepting responsibility.

## ARGUMENT

**1.  There Should Be No Further Changes to the Relevant Conduct Calculation in the PSR**

Defendant Hines admitted in his post-arrest statement that since no later than November 2006, he purchased cocaine at a rate of approximately four-and-a-half to nine ounces of cocaine every two weeks, cooked it into crack cocaine, and sold the crack cocaine. In the PSR, using the low end of defendant's estimate in order to be conservative, the probation office concluded that defendant should be held responsible for an additional 54 ounces of crack cocaine as relevant conduct. PSR at 3. According to defendant's August 14, 2008 filing, the probation office has been asked by defense counsel to change the figures, and calculate defendant's relevant conduct as if the additional drug quantities at issue were powder cocaine, rather than crack cocaine. Def. Obj. at 2.

No supplement or addendum to the PSR has been issued to date. In the government's view, none should be issued, because the original calculation was correct. Even though it is certainly true that defendant initially *purchased* the drugs at issue in the form of powder cocaine, defendant admitted that he then transformed the powder cocaine into crack cocaine and distributed it.

Defendant's admission is fully consistent with other evidence in the case, including the agents' discovery of cocaine residue in defendant's kitchen (and on cooking implements in the kitchen) and information supplied by Individual A. Thus, defendant's purchase of at least four-and-a-half ounces of cocaine every two weeks, and transformation of that powder into crack cocaine, and distribution of it, should be calculated as at least four-and-a-half ounces of *crack cocaine* being possessed and distributed during that time frame, as part of the same course of conduct and common scheme and plan as the offenses of conviction.[1]

**2.     The Court Should Refuse Defendant's Request to Ignore Relevant Conduct**

Defendant asks the Court to sentence him based on the quantities of crack cocaine in the indictment, and to ignore his related, additional crack cocaine distribution in formulating a sentence. Def. Obj. at 3-9. Defendant offers two reasons: (1) he pled guilty to the two counts charged in the indictment, *id.* at 3-6; and (2) the amounts of crack cocaine at issue are unreliable estimates, *id.* at 7-9. Neither reason withstands analysis.

First, as to defendant's plea of guilty, it is the defendant's burden to demonstrate that he is entitled to a reduction for acceptance of responsibility under Guideline § 3E1.1. *United States v. Gordon*, 495 F.3d 427, 431 (7th Cir. 2007). Simply pleading guilty to the indictment is not sufficient to earn an acceptance reduction. *Id.* ("A defendant who enters a guilty plea prior to trial is not entitled to an adjustment for acceptance as a matter of right."). The first application note to

---

[1] One gram of powder cocaine is at least equal to one gram of crack cocaine. Indeed, that is a conservative estimate, because more typically a gram of powder cocaine will yield a greater amount of crack cocaine, due to adulterants that are customarily added to the powder as part of the cooking process.

Guideline § 3E1.1 addresses how a defendant's position with respect to relevant conduct affects his eligibility for an acceptance reduction:

> In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:
>
> (a)  truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. *However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.*

App. Note 1 to Guideline § 3E1.1 (emphasis added). The Seventh Circuit enforces this principle, affirming courts' denials of acceptance credit where defendants frivolously contest relevant conduct in the face of convincing evidence to the contrary. *Gordon*, 495 F.3d at 431; *United States v. Lister*, 432 F.3d 754, 759-60 (7th Cir. 2005); *United States v. Booker*, 248 F.3d 683, 690 (7th Cir. 2001).

Here, the government has established – through defendant's own admissions, as corroborated by the evidence discovered at defendant's residence (e.g., additional crack cocaine, cocaine residue in the kitchen, drug wrappers, drug money) and by defendant's lack of any legitimate income source – that the crack cocaine activities charged in the indictment were part of a larger course of conduct. Defendant's "job" was buying powder cocaine, turning it into crack cocaine, and selling it. If defendant now denies this larger course of conduct, in the face of convincing evidence to the contrary, then he is frivolously contesting relevant conduct and should not receive any downward adjustment in his offense level.

Moreover, defendant cannot hide behind his lawyer to avoid the consequences of his argument. *See* Def. Obj. at 7 ("Counsel's decision to pursue a legal argument as an advocate appointed on behalf of Mr. Hines is part of the totality of the circumstances test."). Defendant's challenge is a factual one, not a legal one: either he acknowledges that he distributed the additional crack cocaine – as he admitted previously, as the government's other evidence corroborates, and as the probation office has found in the PSR – or he denies it. *United States v. Acosta*, —F.3d—, 2008 WL 2738062, *4 (7th Cir. July 15, 2008) (defendant's challenge to drug-quantity amounts attributed to him as relevant conduct in PSR was a factual dispute, not a legal one, thus jeopardizing defendant's eligibility to receive acceptance credit). And if he denies it, then he must produce evidence to support his claim. *Gordon*, 495 F.3d at 432 (where a defendant wishes to deny a pre-sentence investigation report's findings concerning relevant conduct, he must do more than simply deny the information presented; he must present evidence); *Lister*, 432 F.3d at 760 (same).[2]

Second, defendant argues that the Court should find no relevant conduct because the drug trafficking quantities estimated by defendant during his post-arrest statement were unreliable. Def. Obj. 8-9. This, again, would require the Court to turn a blind eye to the full scope of defendant's conduct. Defendant admitted a regular course of activity: for the six months to one year preceding his arrest, approximately every two weeks, he bought four-and-a-half to nine ounces of powder cocaine, cooked it into crack cocaine, and distributed it. That's what defendant said. He didn't say his activities were irregular, or that he didn't remember, or that it didn't happen; it did happen, and

---

[2]As the Seventh Circuit endorsed in *United States v. Chen*, 497 F.3d 718, 720-21 & n.2 (7th Cir. 2008), the government suggests that the Court directly question the defendant at sentencing to determine whether he understands and agrees with defense counsel's arguments concerning relevant conduct. If, in fact, he does, then his contest of relevant conduct is frivolous, and he should not receive an acceptance-of-responsibility reduction.

it was a pattern. Rather than holding defendant responsible for all of that conduct, both the government and the probation office took the most conservative estimate, using the lower ends of both time period (six months, instead of a year) and quantity (four-and-a-half ounces, instead of nine), giving the defendant the benefit of any doubt.[3] The government also, being conservative, did not incorporate into its calculations the estimates made by its cooperator, Individual A, opting instead to rely on defendant's own estimates. Indeed, the evidence found at defendant's residence – including a an empty half-kilo wrapper and drug proceeds – suggests that if anything, defendant was minimizing the extent of his drug trafficking. The government's approach of using all the available evidence, including defendant's own statements and evidence found at the scene, to make a reasonable estimate is an appropriate way of calculating defendant's relevant conduct. *Acosta*, 2008 WL 2738062, at 5 ("Drug quantity for purposes of determining the applicable sentencing guideline may be established by the use of reasonable estimates.").

**3.     The PSR's Criminal History Calculation Appears to Be Correct**

The probation officer identifies three prior convictions that give rise to criminal history points: (1) a 2002 conviction for possession of a controlled substance, resulting in one point, PSR at 4; (2) a 2004 conviction for driving on a suspended license, resulting in two points, PSR at 5; and a 2003 conviction for driving on a suspended license, resulting in two points, PSR at 5. Invoking Guideline § 4A1.2(a)(2)(B), defendant argues that the 2004 and 2003 convictions for driving on a suspended license should be counted only once, because the 60-day sentences for both convictions were imposed on the same day, June 4, 2004. Def. Obj. at 10-11.

---

[3] If defendant's relevant conduct were calculated using the higher end of his estimates (i.e., nine ounces, twice a month, for 12 months), defendant's base offense level would be in the next highest category: level 38, instead of level 36.

Guideline § 4A1.2(a)(2)(B) provides:

> If the defendant has multiple prior sentences, determine whether those sentences are counted separately or as a single sentence. Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Count any prior sentence covered by (A) or (B) as a single sentence.

Here, defendant's 60-day sentences were imposed for offenses that were separated by an intervening arrest: the arrest for the first offense was on or about August 24, 2001, and the arrest for the second offense was on or about November 18, 2002. PSR at 5. Thus, the sentences are counted separately. Defendant has five criminal history points, and is a criminal history category III.

**4.    Sentencing Position**

The government's position is that – provided that defendant does not frivolously contest his crack cocaine distribution that constitutes relevant conduct – defendant's Guideline calculation should be based on an offense level 33 and a criminal history category III, yielding a range of 168 to 210 months. If defendant does not accept responsibility for the counts of conviction *and* relevant conduct, his offense level is 36, and the Guidelines range is 235 to 293 months. The government believes that a sentence within the Guidelines range is reasonable, and consistent with the factors enumerated in 18 U.S.C. § 3553:

*Nature and circumstances of the offense; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; the need for the sentence imposed to afford adequate deterrence to criminal conduct; and the need for the sentence imposed to protect the public from further crimes of the defendant:* Defendant's offense is very serious; he is a drug trafficker, selling substantial amounts of crack cocaine within

Aurora, Illinois. This conduct cannot be tolerated in this society, given the substantial harm that illegal drugs inflict – dangers that defendant himself knows well, having suffered a mother and father who were addicted to drugs.

A substantial sentence is necessary to emphasize the seriousness of defendant's crime, and to deter him and others. The sentence is necessary to deter defendant, because previous law enforcement intervention has not worked. Defendant sustained his first narcotics conviction at age 17, in Du Page County. PSR at 4. The sentence, 24 months of probation, did not deter defendant, who violated his probation twice. *Id.* More seriously, on December 22, 2003, defendant was arrested in Aurora and charged with cocaine distribution and possession. *Id.* at 6. Those charges are pending in Kane County. Defendant's current convictions are for a May 4, 2007 crack cocaine distribution and a November 28, 2007 possession with intent to distribute crack cocaine – both of which occurred *after* defendant's Kane County arrest. In other words, defendant committed the instant offenses while on bond in Kane County, further demonstrating his disrespect for the law.

*History and characteristics of the defendant:* Defendant's personal history is detailed in the PSR and in defendant's sentencing submissions. Defendant's submissions seek to portray him as someone who provided for his family and was left without any meaningful choice besides selling drugs. Defendant did make choices, however, that have consequences:

Defendant chose to make a living by selling drugs, despite knowing personally how drugs can rip families apart, and destroy homes and communities. Defendant emphasizes the hardships in his own childhood caused by his parents' drug addition. But defendant's own actions have inevitably affected the children and families of those to whom he has been peddling crack cocaine.

11

Defendant is fortunate to have family members who love and support him, as is clear from the letters submitted on his behalf. Nevertheless, defendant chose to expose his 16-year-old sister to the dangers of drug trafficking, bringing her with him in the car to the May 4, 2007 transaction with Individual A (Count One of the indictment). He likewise chose to expose his young children to dangerous drugs, cooking powder cocaine into crack cocaine inside the defendant's home – the same home where the children were living. When agents searched defendant's residence, they found cocaine residue in the kitchen and on drug paraphernalia used for cooking the powder cocaine into crack cocaine (again, out in the open in the family's kitchen).

Defendant also chose not to cooperate with law enforcement. That is certainly his prerogative; no one has to cooperate with a federal investigation. But defendant now seeks a sentence of 120 months – slightly more than a third off the low end of the Guideline range if defendant gets an acceptance-of-responsibility reduction, and a full *half* off the low end if he does not get the three-level reduction. There is no basis for defendant to get that kind of windfall, when – by his own choice – he has done nothing to help investigators identify or charge his narcotics sources.

*The sentencing range established under the Guidelines, and the need to avoid unwarranted sentencing disparities:* Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, — U.S. — , 128 S. Ct. 586, 596 (2007). For two reasons, this Court should give serious consideration to the advisory Guidelines range.

First, the Sentencing Guidelines are the sole factor in Section 3553(a) that provides any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities, which is itself a statutorily-mandated factor, § 3553(a)(6). *See United States*

*v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."); *see also Booker v. United States*, 543 U.S. 220, 250 (2005) ("Congress' basic statutory goal – a system that diminishes sentencing disparity"); *id.* at 253 ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity"); *id.* at 267 (rejecting other remedial alternatives because they were inconsistent with the "basic objective of promoting uniformity in sentencing"). The Supreme Court created the advisory system to "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individual sentences where necessary." *Booker*, 543 U.S. at 264-65. The only way to prevent widespread unwarranted disparities is to give serious consideration to the Guidelines.

Second, the Guidelines generally deserve serious consideration because they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 128 S. Ct. at 594. It is true that there is no "presumption" that a Guidelines sentence is the "correct" sentence, *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007), and that there is "broad" sentencing discretion post-*Booker*. *United States v. Demaree*, 459 F.3d 791, 794-95 (7th Cir. 2006). However, the Commission is "a respected public body with access to the best knowledge and practices of penology; its judgments should not lightly be disregarded." *United States v. Wachowiak*, 496 F.3d 744, 753 (7th Cir. 2007) (internal quotation and citation omitted). Furthermore, the Commission is charged by statute to periodically review and revise the Guidelines as the Commission collects comments and data from numerous sources in the criminal justice system, 28 U.S.C. § 994(o), and these ongoing efforts to refine the Guidelines are another reason to seriously consider the advisory range.

In the event that this court exercises its discretion to sentence outside the advisory range, there are guideposts for evaluating what the extent of the deviation should be and when a non-Guidelines sentence will be deemed unreasonable on appeal. These guideposts are set forth in Supreme Court and Seventh Circuit cases.

First, the Supreme Court instructs that it is "clear that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Gall*, 128 S. Ct. at 594. The degree of the deviation from the advisory Guidelines range is relevant in choosing the particular sentence:

> If [the judge] decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one.

*Id.* at 597. In *Gall*, the Supreme Court affirmed a sentence of probation in an Ecstasy conspiracy case where the low-end of the range was 30 months of imprisonment. Although the Court acknowledged the qualitative difference between probation and a sentence of imprisonment, the defendant presented extensive mitigating facts: his only role in the crime was to deliver drugs to other co-conspirators; he had voluntarily stopped distributing drugs "after deciding, on his own initiative, to change his life," which distinguished him from the "vast majority of defendants convicted of conspiracy"; after withdrawing from the drug conspiracy, he graduated from college and obtained steady employment; when confronted by law enforcement agents, he fully confessed to the crime; when indicted, he moved back to the district in which he was charged and started his own successful business; and he proffered a "small flood" of letters praising his character and work ethic. *Id.* at 591-93, 599-600.

In contrast to the significant and uniquely-personal mitigating facts in *Gall*, the Seventh Circuit warns that major deviations from the advisory range are more likely to be unreasonable if the grounds for the deviation are "overstated mitigating factors" or "normal incidents" of the offense. *Wachowiak*, 496 F.3d at 754. Similarly, the Seventh Circuit admonishes that sentences relying on "common" factors, rather than "particularized" ones, to justify variances are less likely to be substantively reasonable. *Id.* at 750. To be sure, these are only guides and not bright-line rules for assessing reasonableness, but they are helpful in preventing excessive sentencing disparities.

## CONCLUSION

The government therefore requests that the Court impose a sentence within the Guidelines range.

Dated:  August 18, 2008                             Respectfully submitted,

                                                    PATRICK J. FITZGERALD
                                                    United States Attorney

                                          By:  s/ Julie B. Ruder
                                               JULIE B. RUDER
                                               Assistant United States Attorney
                                               219 South Dearborn Street
                                               Chicago, Illinois 60604
                                               (312) 886-1317

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following document:

Response to Defendant Hines' Objections to the PSR

was served on August 18, 2008, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

                                                                                             s/ Julie B. Ruder
                                                                                            JULIE B. RUDER
                                                                                            Assistant United States Attorney
                                                                                            219 South Dearborn Street
                                                                                            Chicago, Illinois
                                                                                            (312) 886-1317